15 minutes to be shared by Corporation and Amici, 15 minutes for the Board, and 5 minutes for intervener. Mr. Rutherford, you may proceed for the petitioner. Good morning. May it please the Court, Oliver Rutherford, Counsel for BrownForman Corporation, and I'd like to reserve 2 minutes for rebuttal. The National Labor Relations Board, in its CEMEX decision, rejected the Supreme Court's holding in Gissel, a holding that has existed for over 55 years. It's been applied by every circuit court in the country, and it acknowledges that bargaining orders are extreme remedies that should only be imposed if the possibility of conducting a fair rerun election. That's kind of a fundamental question. You say that the Board rejected a Supreme Court opinion. Is the Board authorized to overrule Supreme Court decisions? The Board is absolutely not authorized to overrule. Is that basically your argument, is that they have refused to foul a Supreme Court precedent and therefore CEMEX is an unlawful decision? That is one of our arguments, Your Honor. That's kind of basic. I know I need to ask the other side this, but that's one of your positions, right? That's correct, and the reason why we are saying that Gissel constitutes a Supreme Court precedent and not just simply a rubber stamp or approval of a Board process, if you will, is that the Supreme Court in Gissel came up with a new standard. It defined a new standard for— Was it coming up with a new standard, or was it looking at the Board standard and deciding whether that was within bounds of the statute? The Board did not have an existing standard at that time. The standard in the underlying Gissel Board action was that an employer could not deny a union's claim of majority support absent a good faith doubt as to whether they actually had majority status or not. That was the underlying Gissel Board opinion, and when it came up to the Supreme Court, it was left to the Supreme Court to actually articulate what that standard was, and that's exactly what the Gissel Court did in an exercise of its own authority, and it created the three-tier approach to assessing bargaining orders that we've lived with for 55 years. Right. I thought it was saying what was in bounds and what was out of bounds. Like, if you have really minor issues, you can't—the Board can't order a remedial bargaining order, but if it meets these other two standards, then it could, but that doesn't suggest to me that that's all the Board could do. It's saying this is out of bounds, this is in bounds. As long as the Board is within the bounds, it's okay. Right, and the Gissel opinion does not include language to that effect, but the— I mean, by coming up with the two that says these two are in bounds, you can give a remedial order. This one is out of bounds. Isn't that creating the outer boundaries? It—Gissel created the standard for certain, and Gissel was—the Gissel Court— I don't understand what you mean by Gissel created the standard. The Board came to the Supreme Court. I know they changed their position, that oral argument, to say, this is what we want to do, and it's up to the Supreme Court to say whether that's okay, what you want to do, right? But the Supreme Court, Your Honor, was left to articulate what that standard was because the Board had not done it previously, and that's exactly what the Supreme Court did when it created the test for assessing whether a fair rerun election could be held. Is that test based upon the statute? The act? It flows from the act. It flows from 10C, which is the statutory provision that grants the NLRB remedial authority. Isn't really the question here whether the Board is able to shift from a prospective standard about whether you can conduct a fair election after a ULP to a retroactive standard that says you don't look to the future, and whether they have to follow the Supreme Court's admonition that they have to test the likelihood of being able to conduct a fair election? Isn't that what we're talking about here? In a nutshell, yes, Your Honor. That's exactly the test that's at issue. Assuming that that's the test, and we've sort of summarized it here, had the Board proceeded by way of adjudication, would they have been able, under the act, to set that new test? The Board would have been able to, had they articulated a standard at the Board level, and so if the Gissel Board opinion had actually set the standard and the Supreme Court simply approved that standard and affirmed the decision of the Board, then we'd have a much more difficult time arguing that it's not the holding. I really don't understand what you're saying. It's a simple question. Would they have been able to do it by way of rulemaking rather than adjudication? If they had done it by way of rulemaking, yes, because they have that authority. So this is a process question. They didn't do it right. So I get that, but what's troublesome here is both of you have set forth this plethora of issues, the vast majority of which don't seem to be really contested or seem to be contested. There's no ULP here, right? Correct. That's just stunning on this record, but I'll give you this. If you're right that you look only at what an employer does after the petition has been filed, maybe you're right, but that doesn't make any sense. So it just seems like there's a plethora of evidence, from the fat cat to the emails that are being distributed by your own client saying, oh boy, looks like they got majority status. We got to do something. What are we going to do? Can you tell me in a nutshell how this is not a ULP? Sure. So we've looked to the Exchange Parts case, which is U.S. Supreme Court precedent, which says that benefits can't be given for the express purpose of impinging upon employees' freedom of choice. None of the benefits that were provided to employees were conditioned on the outcome of the election. There was no promise of benefit, which has been found to be coercive. At the same time that we gave the increase that we did to the Woodford Reserve employees, we gave a $2 an hour across-the-board increase to Old Forrester, which is a non-union facility. Again, there was no message delivered with the grant of benefits that those benefits would be taken away if the outcome of the election were different. In other words, the employees were free to accept the benefit and vote for the union. And you think Exchange says that you have to condition whatever benefits you're giving to try to encourage the employees not to unionize? You have to make them conditional? That's what you think Exchange stands for? I'm saying that Exchange stands for the proposition that you cannot impinge upon their free choice. And there was no impingement on the free choice when they had every right to vote in favor of the union, even after the grant of benefits. Okay. Thank you. Let me ask, if I may. I just want to make sure I heard you correctly going back to the sort of rulemaking versus adjudication. Was it your position that, or did you just argue that the NLRB could have done what it did in CMEX by rulemaking? That would have been okay. Yes, through the Administrative Procedures Act. They could have promulgated a rule, posted it in the Federal Register, given an opportunity. Does the Board do rules? They have the authority. They have done it more so recently. For example, with respect to the joint employer rule, that was done through promulgation of rules. I believe the decertification, the process for how you handle a decertification petition was handled through rulemaking. And then I believe there are rules surrounding how nurses or healthcare workers are able to strike. So they have done rulemaking before. Okay. So I just assume there's advantages of rulemaking because you can get notice and comment. You get more input rather than adjudication. You just have the two parties before you. Correct. And they set forth a brand new standard, which is contrary, I think, to the Supreme Court precedent for all cases. And anyway, your position, the rulemaking is the preferred way to make a general rule that's applicable to everybody else. Yes, Your Honor. That's what they've done here. But it sounds like what you're arguing is that the Board can't overturn Supreme Court precedent by rulemaking, but if it does it through adjudication, that's a problem. Because I thought you just argued that if they did the same thing through a rule, that that would be okay, which was still, in your mind, conflict with JISL. Unless it's contrary to Supreme Court precedent. I don't think they could issue a rule that's contrary to Supreme Court precedent and not have it struck down. The other problem I have is the retroactivity of CEMEX. To me, it seems fundamentally unfair to find an unfair labor practice for violating a rule that's made through adjudication that occurred later. Like, how can you be deemed to have committed an unfair labor practice when at the time it was not an unfair labor practice in 2022 when CEMEX doesn't come through through 2023? And retroactively, you committed this practice. Can you expand on that argument a little bit? Sure. So, at the time that the union approached Woodford Reserve with a claim of majority status, the law at that time was that under Section 8A5, we were permitted to essentially deny and wait for the union to petition for the election. And wait for them to petition for the election. And how they found an unfair labor practice because the employer did not petition for the election. Correct. Which they were not required to do at that point. Correct. Is that really true? Because the union filed a petition and then you entered into, with the union, a stipulated order that basically agreed to the petition that there would be an election. Yes. The basis for... This whole business that you guys are arguing about, about, oh, now they're changing the standard of who has to request an election when, really is not before us in this case, is it? It is to the extent that the ALJ determined that we violated Section 8A5 by refusal to  I think there was a specific finding by the ALJ that you violated, that you committed an unfair labor practice by not petitioning, right? By refusing to accept the majority, the claim of majority support from the union. They didn't find that you committed an unfair practice by not petitioning because, in essence, you joined in the petition by the union, right? But getting back, you didn't have to accept those cards that were just signed by 36 of the prospective union members. We were entitled to. Because at the time, you could petition for an election rather than accept those cards. But they found that, okay, they found that you committed an unfair labor practice by not accepting those cards. Correct, and refusing to bargain, essentially, at that time. Okay. Okay. Anything further at this time? You'll have your rebuttal. Yes, thank you, Your Honor. Let's hear from the amicus. Good morning. Good morning, Your Honors. May it please the Court. My name is Michael Keneally, and I'm arguing on behalf of the 11 amicus organizations. I'd like to start by thanking the Court for the opportunity to participate in oral argument today. We asked for that opportunity because the Board Semex decision upends a half century of federal labor law and obviously affects many more than just the parties to this case. It's a very important development in the law, and this Court may be the first to rule on whether the decision is consistent with Gissel and its progeny. I'd like to jump in with the issue that came up with Mr. Rutherford, which is how to understand what Gissel was actually doing, because I think everybody agrees that the Board doesn't have the authority through adjudication or rulemaking to overrule the Supreme Court, and the question is, what did Gissel actually do? And to answer that, I would suggest the best place to look is this Court's own precedent applying Gissel for many decades. The Board has consistently been reversed by this Court when it attempts to move beyond the analysis that Gissel prescribes, and that is the analysis, Judge McKeague, you brought up, is a fair rerun election possible? So this Court said, for example, in 1990 in MPC plating, to issue a bargaining order, the Board must make factual findings and must support its conclusion that there is a causal connection between the unfair labor practices and the probability that no fair election could be held. And this Court has said many times since MPC plating, and in cases even beforehand, and I could give you a half-dozen Sixth Circuit decisions that say this, that when the Board fails to make that finding, its bargaining order can't stand. Now what CEMEX does is it tries to say at a wholesale level, we're not even going to care about that question anymore, we're not going to even ask whether a fair rerun election is possible. I mean, that's because it overrules Linden Lumber, where the standard comes from. I know it was discussed in Giselle, but then Linden Lumber sort of codifies the standard. And so I understand why our cases would support that, but CEMEX goes in a different direction, which my understanding, correct me if I'm wrong, isn't the Board allowed to overturn its prior decisions? Well, Linden Lumber was about the employer's obligations when a card check majority is set forth. Before that, though, we have the Giselle case, and that's the case that really sets forth the fair election as the determination about whether a bargaining order is appropriate. That's the category two in Giselle. It says we're not in the category of such severe and outrageous unfair labor practices that we're going to allow a bargaining order per se. We're going to instead look to see whether the Board finds that the possibility of ensuring a fair election or a fair rerun is slight, and therefore, we're going to use the card check as the best evidence of majority support. And so even before Linden Lumber, this Court, other circuits as well, have said, under Giselle, we have to ask whether a fair rerun election is possible. And so this Court, you know, in just, for example, the Taylor machine products, I mean, these cases are all in the briefing, so I don't need to go through them all. But this Court has had a three-part requirement for a bargaining order, and the third requirement is the one that's kind of key here. The Board has to find that a fair election cannot be had under all of the circumstances of the particular case. And that's what CMEX says, CMEX says is no longer a necessary finding. And the Board basically justified adopting that new rule because under the old rules, and it says this in CMEX itself, reviewing courts have been reversing the Board's bargaining orders out of a disagreement about the possibility of a fair rerun election. And CMEX says, well, we're just not going to bother with that inquiry anymore. We're going to say that the commission of an unfair labor practice that requires setting aside an election is itself enough to justify a bargaining order if a card check majority was previously shown. And of course, after Loper-Bright especially, the courts have the final authority on what the NLRA requires. And so if something was settled law before Loper-Bright under this court's precedent, under Supreme Court precedent, and the precedent of all the other circuits that applied the Supreme Court's ruling in Gissel, I don't see how after Loper-Bright the Board can just 180-degree change. The question is, how specific is the Act itself, the language of the Act? And yes, under Loper-Bright, we don't defer to the Board in determining ambiguities in the Act, but tell me why CMEX is contrary to the wording of the Act and therefore should not be filed under Loper-Bright. So I would start with Section 7 of the Act, 29 U.S.C. 157, which lays out what employees' rights under the Act are. And they can engage in collective bargaining, they can select a representative to do so, or they have the right, quote, to refrain from any or all of such activities. And the majority wish of the bargaining unit employees is what governs whether a union represents their interests or not. And so the question under CMEX, under the Act itself, is whether a majority of unions support a union, I'm sorry, a majority of employees support a union. And Section 9 lays out different ways that that question can be answered, and one of those ways is through the conduct of a secret ballot election. And one of the... Which is the preferred remedy. Which is the preferred remedy, especially in cases like this one. The secret ballot, I mean, we have secret ballots at our general elections, except for absentee ballots, but the secrecy of a ballot is to help prevent coercion. And I know that there's a lot of history that these cards that are signed, even though the ALJ said the signatures appeared to match the members, that one of the inherent problems with these signature cards is they're subject to coercion by the labor organization. And that's, I think that's one reason that the Act has a secret ballot provision in there, which is the preferred remedy, right? Yes, I think that's exactly right. And that's one of the reasons why various courts of appeals over the years have said an election, a rerun election, if it can be fairly held, is the preferred remedy. Because we know that that secret ballot is the best way in most circumstances to effectuate employee preferences in a reliable way. Unless the court has other further questions for me, again, thank you for the opportunity. Further judgment. All right. Thank you very much. Let's hear from the board. Good morning. Good morning. Excuse me. I'm going to start right in on what seems to be the biggest conversation piece here, is whether the board contravened Gissel in this case. And obviously it's the board's position that it did not. As I think we've highlighted in our brief, that Gissel by no measure set forth the exclusive provision for analyzing interferences with elections and determining when bargaining orders are appropriate. It certainly resolved the question in that case, in a way of looking at a prospective interference. But it's the board's position that nothing in Gissel is read as that is the exclusive avenue for making an affirmative bargaining order. That the policy choice, as Judge Mathis, I think, was discussing with opposing counsel, that what we have here is a different policy choice under the act. And an exercise of the board's discretion that it's allowed to under delegated authority. It acted rationally. It spelled out all of the reasons for why it was taking a different policy choice. Different does not mean contrary. It doesn't mean that it is overruling Gissel. Of course, the board has no authority to do that. What they did instead was, and they walk through all of the reasons why, the bargaining orders as they had been existing, or as they had been being ordered under Gissel, were no longer achieving the purposes of the act. No longer sufficient to protect the interests of the free choice elections. So the board made... They did this in the adjudication process, but, I mean, isn't that more appropriate than rulemaking? I mean, if you're going to consider all these policy choices and... I don't think I'm in a good position to say whether rulemaking or adjudication was the better route. The board had at its disposal either avenue. And the board has discretion to determine that it will decide matters through adjudication. And many of the issues that some of the employers, I think, are briefing, some of these straw man arguments, they will be fleshed out through adjudication. So whether... Like I said, I don't think I'm in a position to say rulemaking would have been better. I think I'm in the position to say the board has the discretion to determine whether it will engage in rulemaking or adjudication. And in this case, it opted for adjudication. They could have done rulemaking here, and they've done rulemaking in the past.  There's no question they could have done this through rulemaking, but that... Making a different choice doesn't make it irrational or inconsistent with the act. It just means the board made a different choice. There's got to be a line somewhere between when you can establish new principles through adjudication versus rulemaking, right? Sure. So aren't we looking here at where is that line and which side of the line did this case fall on? But I think that what the board did here, and we cite in the brief, the cases that suggest that it's up to the board in the first instance to determine that it's, I think, we cite to the cases that there's a lot of discretion granted to the administrative agency. But it seems like in the cases where they've done it by adjudication, I don't think anybody questions your ability to change things via adjudication, but it all seems to involve extensions of existing principles and applying it to the facts of this case. And I think the interesting part here is you look at the board's order, and it's got Section 1 and 2, and that deals with this case. And then you've got Section 3 that really doesn't have anything to do with this case. It's establishing a new policy under the confines of this case, but without anything to do with this case. Is that a fair characterization? I don't know that's a fair characterization. And I remind the Court that even under Gissell, under Linden Lumber, under Joyce Silk, that those policy or those policy determinations by the board in those cases was made in the adjudication context. Those were not rulemaking cases either. This is just simply another version of when bargaining orders will be appropriate. Are you contending that this was an extension of existing policies? It's a – I'm sorry, am I? Are you contending that what they did here is simply an extension of the policies that they – that were established by the Supreme Court in Gissell? Maybe policies is the wrong word. What I'm suggesting is that the board has determined that in certain types of circumstances now a bargaining order is appropriate because what they have been doing in the past is not effectuating the purposes of the act. And the board can do – can initiate new principles in adjudication, correct? As long as it's – Absolutely. Absolutely. So long as it's rational and that the policies – so long as it's rational and consistent with the Delegated Authority Act. And I think in the CEMEX decision – But that generally assumes that there isn't an overriding Supreme Court decision. And I don't believe there is an overriding – there is an – there's Gissell for sure, but it's the board's position that this is not contrary to Gissell. This is – Gissell, again, I feel like I've said it before and I know it's in our brief. Gissell does not set forth an exclusivity requirement. In fact, I believe in Gissell, the union in that case pressed for pretty much what CEMEX held now. And the court in that case – and the Supreme Court in that case did not decide that issue. So the – I think it's an overreading of Gissell to say that the Supreme Court has spoken and has announced a singular path for a bargaining order where there's been interference with an election. That's simply not what Gissell did. How about subsequent court of appeals decisions and court decisions interpreting Gissell? You say that their interpretation of Gissell's not correct, but haven't the courts interpreted Gissell as binding precedent and not just – not the way you argue it? But within the confines of Gissell, that they're just applying Gissell. But that doesn't – just because the courts of appeal are then interpreting whether a prospective election, looking at whether a rerun is possible, they're just applying Gissell appropriately. That doesn't necessarily mean that when the board announces a new policy that Gissell then all of a sudden takes on a different – That's the other problem. Again, a new policy that's applied retroactively and the board and the ALJ found an unfair labor practice for them to failing to file a policy that was promulgated a year after these events. How is that fair? I want to be very clear on what the unfair labor practice was and what it was not. It was not the employer's failure to file a petition. That was not the unfair labor practice here. That did not happen in this particular case. The unfair labor practice was refusal to bargain based on the hallmark violations, granting and implementing benefits with the intent of affecting the election, and the interference with the election. Those are longstanding violations of labor law. I thought the violation – I mean, I can read the ALJ's opinion, but I thought it was refusing to bargain with the union after they presented the cards. That was an unfair labor practice, wasn't it? No, the unfair labor practice is – yes, based – the unfair labor practice is, again, refusing to bargain. Yeah, okay. But they weren't required to bargain before CEMEX because Gissel said that if they – all they had to do is wait for the union to petition for the election and that if the union won the election, then they'd have to bargain. But now, all of a sudden, they have to bargain before there's an election. I mean, that's what they were found, isn't it? So that goes to the remedy. So I think this is another sort of sticky point in terms of the retroactivity analysis. There's the unfair labor practice, then there's the remedy, which is the bargaining order. And it's important, I think, to draw that distinction because the retroactivity analysis changes when you're looking at the remedy. An employer isn't going to be found to demonstrate a manifest injustice if they claim, well, we wouldn't – we wouldn't have done what we did had we known the remedy would have been different. We wouldn't have violated the law if we really thought we were going to be issued a bargaining order. We only would have done it if we were going to be issued a cease and desist and the possibility of a rerun election. So I think it's very important to keep the remedy portion of it distinct in terms of the retroactivity analysis. Okay. I mean, there's a remedy, but there's also a violation. And they – the ALJ and the board, by adopting the ALJ, found a violation of 8A5-1 of the act by failing and refusing to recognize and bargain with the union. I mean, and I just can't see how that's fair when at the time they weren't required to do it. Again, under the retroactivity part of it, though, those are longstanding violations – the unfair labor practices. They were required before CEMEX to bargain with the union by them just presenting a majority of the cards that purported to have the signatures? No, but they were required not to violate the law – violate the act and make promises and benefits and implement changes. Well, that's a separate violation. And the ALJ found separate violations. Right. This was – you know, this was violation number two, I guess. And so he compounds this with the other one to come up with a remedy. I'm just saying whether there is a violation of refusing to bargain is a separate issue. And I don't see how that can be sustained, that's all. And I would point out, too, that in our brief, to the extent that the court does look at the manifest injustice analysis on the violation part of it – again, keeping the remedy separate because that's a different one – but to the extent that there's any sort of balancing, employee rights do take precedence over reliance on board law. And we note that also in our brief. I don't know. I don't know that I have any other – Okay. Any further questions? Is there anything further from the court? No. All right. Let's hear from the intervener. Good morning. Good morning. May it please the Court, Your Honors. My name is Willie Burton, Jr. I'm here as counsel of the intervener, Teamsters Local 651. Your Honor, we believe this case is straightforward. We believe it's a textbook example of a well-timed grant and benefits violation. The employer responded to a union organizing drive. It knew it had majority support with several UOPs, all of which were financial in nature, which actually goes to the germane understanding that the employer had, which stems from that October 4th email. At that October 4th email, two things became clear. The union had majority support and that wages were – How does the employer know that? They have these signature cards that purport to have the signatures of a majority of the union members, but they don't know the circumstances of the signing. And I think one reason you have secret ballots in union elections is because of the coercive nature of getting these cards signed. There's history that unions in the past would coerce people to sign these. Sometimes they were fraudulent. Here the ALJ city actually examined the signatures and determined that 36 of them, I guess, matched the voter registration lists and everything else. But he didn't make any finding of where the coercion occurred. And with that, I mean, there's a reason for the secret ballot. Is there not? And isn't that because of the coercive nature of these signature cards? Your Honor, I would point to the Frank Brothers and Loy Lard decision, which says that it's the board's prerogative, and within their discretion, to determine when it's more appropriate to pursue a rerun election or to give effect to the prior demand for recognition. And I would highlight, Your Honor, that CEMEX allows for the employer to file a petition. And in that case, they are allowed to test the union's majority support. But when they sabotage that first timely opportunity to have an election and also erode the union's majority support through these hallmark violations that traditional remedies cannot cure because they tend to linger, then it is certainly within the board's power to essentially give a bargaining order or to issue a bargaining order and give effect to the prior demand for recognition. Okay. If we just put aside the ULP question for just a second, how do you address the question of whether or not CEMEX is simply extending an existing principle to the facts of this case, which I think everybody would probably agree they can do that, versus establishing a new policy that's not only a new policy that may or may not be in accordance with the Act, but seems to be contrary, at least on the surface, with GISSEL? Well, Your Honor, we think that the board has simply changed the inquiry. Changed what? They changed the inquiry. They changed the question in order to assess when bargaining orders are appropriate. In that sense, GISSEL remedies something different than what CEMEX remedies. CEMEX essentially is the board looking back in time and deciding that the type of violations that were engaged or the type of violations that occurred here, all right, in order to effectuate the Act, we must give effect to that prior demand for recognition because the employer's conduct has essentially eroded the union's majority support, making it unlikely that a rerun election would even give effect to the Act, Your Honor. And essentially in that sense, there's many factors that the courts have come up with as it concerns assessing whether a rerun is appropriate. And in many cases, the employer eroding the majority support in this context, particularly through a wage increase, which that wage, the financial benefits, they cannot be removed from the employee's paycheck. Okay. What you seem to be saying is they sort of did what GISSEL did, but the footnote in the board's opinion says that they don't rely upon the ALJ's decision that a bargaining order is warranted under the separate framework in GISSEL. So they're not following GISSEL at all. They're saying we're no longer going to follow GISSEL. We're going to look backward rather than forward. Yes, Your Honor, and we think that is appropriate because, again, in this context, the violations, if you look at them, they're all financial in nature, which stems from the germane issue. You have the changes to the eligibility requirements for annual merit increases. You have the changes to the vacation policy. Essentially what that was about is affording workers more opportunities to work during the Christmas holidays. You have the gifted bottle bourbon, and you have the wage increase. All of these violations gave benefits to the employees that essentially cannot be undone. Okay. And in that context, having a rerun is just giving the employers essentially a second bite of the apple and really subject to allowing the unit to be subject to the same contract that was engaged in at the first timely opportunity for the employer to test the union's majority support, again, later down in the future. And so in that sense, it is completely within the board's discretion to decide, in order to fulfill the purpose of the act, that they should be able to give effect to that prior lawful demand. Just a quick follow-up question. It seems to me that your whole argument assumes that this is a Category 1 ULP under GISL, when they don't even say that. This is Category 2. So if this was Category 1, I think you're probably right, but I don't understand how that's correct under Category 2 or Tier 2, however you choose to refer to it. Well, Your Honor, we think that the board is really assessing whether or not these violations, and I would actually point the court to this court's decision in Burke Machine Tool Co., which speaks to even the lesser violations we'll see in regards to significance, also being something that the board could remedy with the bargaining order. Because here, what it is more so about is that those traditional remedies, the cease and desist order, notice postings, cannot cure the harm here as they may, even, for example, Your Honor, perhaps maybe in a termination case even, where back pay could be given and an individual be reinstated. So you don't think there's really a difference between Tier 1 and Tier 2? Not in CIMEX, because CIMEX is, again, changing the inquiry to ask what is the actual effect of the UOPs. Okay. Even the passage of time would not make any difference. I mean, here it's 2002, we're at 2025. I mean, what if it's a 10-year period? I mean, the argument is still that there could not be a fair and free election, even with the passage of time, because of the past violation. Well, Your Honor, suppose there could be a free election, but that would not effectuate the purpose of the act because it would not remedy the harm that was passed down by the employer to the union and to the workers who made a valid and lawful demand for recognition those years prior.  All right. Anything further? All right. Thank you, counsel. All right. Rebuttal. With respect to this Court's application of Gissell, I'd like to direct the Court's attention to the Exchange Bank case, a 1984 Sixth Circuit opinion. And it's significant because in Exchange Bank, this Court expressly recognized that the U.S. Supreme Court, quote, established the Board's authority to order an employer to bargain with a union. And that's at 6263. With respect to rulemaking, so the entire purpose of rulemaking, particularly when you're talking about a sea change to the standard that's being used for union organizing and assessing employee sentiment for majority support or not, rulemaking is particularly appropriate there because it gives notice and it gives an opportunity for comment. I would point out that in the CEMEX decision itself, the Board didn't even allow amicus briefs to be filed to get, you know, different perspectives on what was being proposed there. Well, I mean, your argument is rulemaking is preferable, and I think we all agree with that. But what's your best authority that adjudication, which basically results in rulemaking, is unlawful, that violates the Act or due process or whatever you're arguing? Because adjudication in this context doesn't perpetuate the purposes of the Act because it compromises employee Section 7 rights. And by that, I mean, in the GISSL analysis, if an employer – or I'm sorry, in the CEMEX analysis, if an employer refuses to file a petition, refuses to honor a claim of majority support from the union, a bargaining order issues. That's the default remedy. And so you're relegating employee Section 7 right, their freedom to choose whether to be represented by a union or not, you're relegating that to the action of the employer. And that, to me, seems to not perpetuate – I mean, Section 7 is a core right in the Act. And I just don't see how adjudication in CEMEX fulfills that right. And in particular, this whole new standard in the CEMEX opinion itself wasn't necessary to the outcome of the case because they found a GISSL order was appropriate there. And so it didn't affect the outcome of that case. It could only be prospective in nature. And when you're talking about prospective action and you're talking about a C change to the standard. Didn't they apply the new standard to that case? They applied CEMEX retroactively, yes, but it wasn't necessary to the outcome in the sense that they relied on GISSL. Okay, any further questions? Judge McKeon, Judge Mathis? Thank you. Thank you, Mr. Rutherford. The case will be submitted.